UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY LEE BERRY,

                    Petitioner,                    Case Number 2:10-CV-11398
                                                      Honorable Victoria A. Roberts

v.

GARY J. CAPELLO,

                    Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS
CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING
PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS**

       This matter is before the Court on Petitioner Gregory Berry's petition for a writ of habeas

corpus, filed under 28 U.S.C. § 2254.  Petitioner was convicted after a jury trial in the Wayne Circuit

Court of first-degree murder,  MICH. COMP. LAWS § 750.316(b), assault with intent to commit armed

robbery, MICH. COMP. LAWS § 750.89, and possession of a firearm during the commission of a

felony. MICH. COMP. LAWS § 750.227b.  Petitioner was sentenced to life imprisonment for the

murder conviction, fifteen-to-twenty years for the assault conviction, and a consecutive two years

for the firearm conviction.

       The petition raises eight claims: (1) Petitioner's sentences for both murder and assault violate

double jeopardy; (2) the admission of hearsay evidence violated the Confrontation Clause; (3) the

admission of other bad acts evidence violated due process; (4) the prosecutor erroneously

commented on Petitioner's failure to testify at trial; (5) the jury was erroneously instructed regarding

the law of aiding and abetting; (6) there was insufficient trial evidence to sustain the convictions;

(7) Petitioner's trial counsel was ineffective; and (8) Petitioner's appellate counsel was ineffective.

       The Court finds that Petitioner's claims are  without merit; his petition is denied.  The Court

also denies Petitioner a certificate of appealability and permission to proceed on appeal in forma pauperis.

## I. Facts and Procedural History

Petitioner's convictions arose out of the shooting death of a customer at a gas station in Detroit.

Jimmy Hamood testified that on September 5, 2003, he was working at the Mobil Gas Station at the intersection of Springwells and the Fisher Freeway. At approximately 4:30 a.m., a young man, later identified as Octavio Hernandez, paid for gasoline and then left the store. Hamood testified he then heard a popping noise outside. Hamood looked out and saw Hernandez lying on the ground and someone dressed in a hooded sweatshirt hop into the back seat of a car as it drove from the station. Hamood called 9-1-1.

Kevin Holbrook of the Detroit Police Department testified that he was dispatched to the scene with his partner, Marvin Stribling. He testified that they found Hernandez lying on the ground. They got a description from Hamood of the two individuals involved. Hamood described one as a white female in her 20's with a red bandana on her head; the other was a male approximately six feet tall wearing a hooded sweatshirt. He told the officers that the car they drove was an older model Sable or Taurus. There were no other eyewitnesses to the shooting. Officer Marvin Stribling's testimony testified consistently with Officer Holbrook.

Shaquita Mack testified that she knew Petitioner's co-defendant, Antoine Hamilton. Mack testified that during the evening of September 5, 2003, she was at a house with her boyfriend, and that Hamilton and Petitioner left the house, returned, and left again before she went to bed. When she woke up the next morning, Mack testifieded that she heard Petitioner tell Hamilton that he did

not have to shoot the guy, and Hamilton responded he had to shoot him because the "guy got cocky." Mack testified that the two men said the shooting took place in southwest Detroit at a gas station, and Hamilton admitted to shooting Hernandez. Mack later talked with her mother about the conversation.

Kathy Carthron testified that she gave police a statement after overhearing a conversation between Shaquita Mack and her mother. Carthron testified that Mack told her mother that Antoine Hamilton admitted to committing a shooting. When asked if she heard whether Shaquita told her mother about Petitioner, Carthron responded she only heard Shaquita say that a "white guy" told Hamilton to shoot the guy. Defense counsel immediately objected to this unsolicited response on hearsay grounds, and the trial court responded by instructing the jury that the statement was not being admitted for the truth of the matter asserted, but to explain why Carthron acted on that information in contacting police. In her written statement, Carthron did not mention that the "white guy" told Hamilton to shoot Hernandez. Carthron admitted that her knowledge of the case came entirely from Shaquita Mack, and that she did not know Petitioner or Antoine Hamilton.

Antoine Hamilton testified that he knew Petitioner for a little while before the incident, and that he had entered into a plea agreement with the prosecutor in exchange for his testimony against Petitioner. Instead of being charged with felony murder, he pled guilty to second-degree murder with a sentencing agreement of 162-to-270 months plus 2 years for the felony firearm charge.

Hamilton testified that on September 5, 2003, he went to the store with Petitioner and returned to a house on Vaughn where they were hanging out with others. They left later. Hamilton testified that he thought they were going to get more drugs to sell. They drove around in a stolen car and eventually pulled into a gas station.

-3-

Hamilton testified that Petitioner, who was driving, handed him a gun and told him to rob a man standing by the gas pump. Hamilton got out of the car and put the gun to the man's head, demanding money. When the man did not respond, Hamilton admitted he got scared and pulled the trigger. Hamilton testified that Petitioner was already driving away from the gas station and he had to run and jump into the car through the passenger side window.

Later that evening, Hamilton and Petitioner stole a different vehicle in Dearborn. Hamilton testified that Petitioner subsequently tried to rob someone else on Warren in Detroit, but he was unsuccessful. Hamilton stated that he gave the gun back to Petitioner.

After he was arrested, Hamilton spoke with Investigator Barbara Simon and told her that the robbery was Petitioner's idea, and the gun belonged to Petitioner. Hamilton opined that Petitioner knew he was going to rob Hernandez, but he did not know Hamilton was going to shoot him. Hamilton admitted that he was not forced to commit the robbery and that he did not have to shoot Hernandez.

Hamilton testified that while he was held in the Wayne County Jail, he was attacked by Petitioner. Hamilton admitted that he initially lied to the police about his name and lied to them at other times throughout this case, including telling Investigator Barbara Simon that he did not shoot Hernandez.

Investigator Barbara Simon of the Detroit Police Homicide Division testified that Hamilton gave her a written statement on September 7, 2003, in which he described the robbery and shooting of Hernandez. Hamilton told Simon that Petitioner was with him driving around Detroit in the Springwells area. He told Simon that with the gun Berry gave him, he got out of the car, walked up to Hernandez and demanded money and when Hernandez refused, Hamilton shot him, ran back to

-4-

car, and he and Berry drove away. Hamilton told Simon that after the shooting, he and Petitioner

drove to a gas station on West Warren and Petitioner tried to rob someone else. Hamilton told Simon

that the gun belonged to Petitioner and that he gave it back to Petitioner after shooting Hernandez.

Dr. Leigh Hlavaaty of the Wayne County Medical Examiners Office was qualified as an

expert in forensic pathology. She reviewed the autopsy report prepared by a retired colleague and

determined that the cause of death was a single gunshot wound to the face.

Sergeant Robert Bulgarelli of the Detroit Police Department testified that he was assigned

to the FBI fugitive task force and that in October 2003, they received information that Petitioner was

in Tennessee. Bulgarelli referred to Petitioner as a habitual offender in his testimony.  At the

conclusion of Bulgarelli's testimony, defense counsel requested a mistrial. The court deemed

Bulgarelli's habitual offender statement inadvertent and denied the request for mistrial, but indicated

that it would give a cautionary instruction to the jury.

Donald Stewart testified for the defense that he was an inmate in the same unit as Petitioner

and that he also knew Hamilton. Stewart admitted that he had prior convictions for theft and other

crimes involving dishonesty. While in segregation, Stewart spoke with Hamilton about this case,

and Hamilton told him that on the night of the shooting Petitioner pulled into a gas station with

Hamilton, and that Hamilton went into the store to buy cigarettes. Hamilton saw a man pumping gas

wearing a Rolex watch, and Hamilton wanted to take it. Steward testified that Hamilton told him that

he walked up to the man with a gun, they exchanged words, and Hamilton shot him. Meanwhile,

Petitioner was trying to leave the gas station, which forced Hamilton to run up to the car and dive

in through the passenger side window. Hamilton told Stewart that Petitioner remained in the car the

entire time and tried to drive away after he saw Hamilton shoot Hernandez. Hamilton told him he

-5-

was going to testify against Petitioner.

Stewart testified that he also spoke with Petitioner in the jail. Petitioner told him he gave Hamilton five dollars to buy cigarettes and the next thing he knew, Hamilton shot Hernandez. Petitioner immediately began driving out of the gas station, and Hamilton dived into the car.

Marvel Daniels testified that he knew both Petitioner and Hamilton from the streets and he saw them in the Wayne County Jail. While in the jail, Hamilton told Daniels that he shot Hernandez while trying to rob him, that Petitioner had nothing to do with it, but that Hamilton would implicate Petitioner to get a plea deal. Contrary to Hamilton's testimony and statement that the gun belonged to Berry, Daniels testified that he was present when Hamilton bought the gun he used to shoot the victim.

In rebuttal, the prosecutor called the officer in charge of the case, Tawnya King. King testified that according to the police report,  no Rolex watch was taken from Hernandez or found at the scene. However, she did not write the report and was not present at the scene of the shooting.

The jury returned guilty verdicts on all counts.

Following sentencing, Petitioner appealed his conviction to the Michigan Court of Appeals. His appellate brief raised the following claims:

I. Whether the prosecutor improperly commented on Petitioner's silence.

II. Whether hearsay testimony was improperly admitted at trial.

III. Whether the trial court improperly admitted prior acts evidence.

IV. Whether trial counsel was ineffective.

The Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Berry*, 2006 Mich. App. LEXIS 2389 (Mich. Ct. App. July 27, 2006). Petitioner subsequently filed

an application for leave to appeal, raising the same claims. The Michigan Supreme Court denied the application in a standard order. *People v. Berry*, 477 Mich. 1031 (2007) (table).

Petitioner returned to the trial court and filed a motion for relief from judgment on October 27, 2007,  the following claims:

I. Whether Petitioner's conviction for felony-murder and the underlying felony violates the Double Jeopardy Clause.

II. Whether the jury instruction on aiding and abetting was improper.

III. Whether there was sufficient evidence to support his conviction.

IV. Whether trial counsel was ineffective.

V. Whether appellate counsel was ineffective.

The trial court denied the motion in an opinion and order dated February 25, 2008.  The trial court found "that the defendant's contentions are without merit and has failed to meet the 'good cause' and 'actual prejudice' requirements of Michigan Court Rule 6.508(D). . . ."  Opinion, at 1.

Petitioner then filed an application for leave to appeal in the Michigan Court of Appeals. The application was denied "for failure to establish entitlement to relief under M.C.R. 6.508(D)." *People v. Berry*, Mich. Ct. App. No. 287814 (January 5, 2009). Petitioner applied for leave to appeal this decision in the Michigan Supreme Court but was also denied relief under M.C.R. 6.508(D). *People v. Berry*, 485 Mich. 862 (2009) (table).

This habeas petition raises the following claims:

I.  Petitioner's sentences for felony murder and the underlying felony are barred by double jeopardy principles.

II.  The admission of hearsay statements by witness Kathy Carthron violated the Confrontation Clause.

III.  The trial court erred in admitting irrelevant and highly prejudicial evidence.

-7-

IV.  The prosecutor improperly commented on Petitioner's silence.

V.  The jury instruction on aiding and abetting was improper.

VI.  There was insufficient evidence to establish Petitioner's guilt.

VII.  Trial counsel was ineffective.

VIII.  Appellate counsel was ineffective.

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court explained that "[a] federal court's collateral review of a state-court

-8-

decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims previously rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id*. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id*. (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5  (1979))(Stevens, J.,

concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, at 786-787.

### III. Analysis

#### A. Procedural Default

Respondent argues that certain of Petitioner's claims are procedurally defaulted. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003), citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of Petitioner's claims.

#### B. Double Jeopardy

Petitioner first asserts that his right against being placed in double jeopardy was violated when the trial court imposed sentences for both his felony murder conviction and his assault with intent to commit armed robbery conviction.

The test for the multiple punishment aspect of the Double Jeopardy Clause focuses on legislative intent. Under *Blockburger v. United States*, 284 U.S. 299, 304 (1932), where the same act or transaction constitutes a violation of two distinct statutory provisions, the test applied by the Supreme Court to determine whether Congress intended to create multiple offenses or only one, is whether each provision requires proof of an additional fact that the other does not. If each offense

-10-

has an additional element, the Supreme Court presumes that Congress intended them to be viewed as separate offenses and warrant multiple punishment.

Petitioner makes an obvious point.  Where assault with intent to commit armed robbery is the predicate offense to a felony-murder charge, one cannot commit the felony-murder without also having committed the assault.  In such a situation, punishing a defendant for both offenses seems to be a straightforward violation of *Blockburger*.  The trial court disagreed, however, and found that, in the abstract, each offense contained an element that the other did not.  The court explained that a felony murder charge can be supported by any one of a number of enumerated felonies, and thus it does not necessarily include an intent to commit robbery as an element.  And conversely, the court noted that one can obviously commit an assault without committing murder.

This examination of the elements of the offenses  in the abstract to determine legislative intent was in keeping with the result reached by the Michigan Supreme Court in  *People v. Ream*, 481 Mich. 223, 241-242 (2008).  In *Ream*, the state supreme court found that the Michigan legislature intended for multiple punishments to be imposed for convictions for felony-murder and first-degree criminal sexual conduct, even where the sexual misconduct offense formed the predicate offense for the felony-murder.  As framed by *Ream*, the question was not whether the specific facts of the charges brought against the defendant constituted one offense.  Rather, the question was whether, in the abstract, each offense could be committed without committing the other one.

The difficult question whether this form of analysis is consistent with the Supreme Court's holding in *Blockburger* need not be answered in this case because the *Blockbuger* test is, at root, simply one  rule of statutory construction.  *See Albernaz v. United States*, 450 U.S. 333, 340 (1981); *Missouri v. Hunter*, 459 U.S. 359, 367 (1983); *Whalen v. United States*, 445 U.S. 684, 691 (1980);

-11-

*Beam v. Foltz*, 832 F.2d 1401, 1411 (6th Cir. 1987). The Supreme Court explained that effectuating legislative intent is all that lies behind the multiple-punishment protection of the Double Jeopardy Clause. Thus, if a legislature intends to authorize cumulative punishment under two statutes–even if those two statutes constitute the same "offense" under *Blockburger* test–multiple punishments after a single trial are permissible. *Hunter*, 459 U.S. at 368-369. As explained by the Sixth Circuit, "[e]ven if the crimes are the same under *Blockburger*, if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." *Banner v. Davis*, 886 F.2d 777, 781 (6th Cir. 1989).

In *Albernaz*, the Supreme Court stated that the "dispositive question" in the multiple punishment context is whether Congress intended to authorize separate punishments for the two crimes. 450 U.S. at 344. "This is so because the 'power to define criminal offenses and to prescribe punishments to be imposed upon those found guilty of them, resides wholly with the Congress.'" *Id*. The Court held that "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed." *Id.*

This point was brought home in *Hunter*, where the Supreme Court was confronted with a case where, as here, two state offenses as applied to the defendant failed the *Blockburger* test, but the state supreme court found that its legislature nevertheless intended to impose multiple punishments. The two offenses at issue were first-degree armed robbery and "armed criminal action." As here, these were compound offenses: one cannot commit armed robbery without committing armed criminal action. Nevertheless, the Supreme Court reversed the finding by the Missouri Supreme Court that punishment for both offenses violated Double Jeopardy:

-12-

Our analysis and reasoning in *Whalen* and *Albernaz* lead inescapably to the conclusion that simply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in *Whalen* is not a constitutional rule requiring courts to negate clearly expressed legislative intent. Thus far, we have utilized that rule only to limit a federal court's power to impose convictions and punishments when the will of Congress is not clear. Here, the Missouri Legislature has made its intent crystal clear. Legislatures, not courts, prescribe the scope of punishments. Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Hunter*, 459 U.S. at 368-369.

When the Michigan Supreme Court applied its own version of the *Blockburger* test in *Ream*–looking at the two statutory provisions in the abstract–it in effect found that the Michigan legislature intended for a person who commits both criminal sexual conduct and felony murder, to be punished for both offenses. The same analysis holds true for felony murder and assault with intent to commit armed robbery. In the abstract, they are separate offenses. The state court is the final expositor of its own laws. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Therefore, this Court cannot second guess the Michigan Supreme Court's conclusion that the Michigan legislature intended for multiple punishments to be imposed on someone who commits both felony murder and the underlying predicate offense. Because that legislative intent has been decided by the Michigan Supreme Court, Petitioner's double jeopardy claim fails

### C. Admission of Hearsay

Petitioner's second habeas claim is that his rights under the Confrontation Clause were violated by the admission of Kathy Carthron's testimony regarding the conversation she overheard

between Shaquita Mack and her mother.  Carthron testified that she heard Mack tell her mother that "the white guy," referring to Petitioner, directed Hamilton to shoot a man at a gas station.  Mack was relaying the conversation she overheard between Hamilton and Petitioner.

In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court held that certain out-of-court statements are barred by the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity for cross-examination, even if the trial court finds the statements to be otherwise reliable. This rule applies only to out-of-court statements that are "testimonial" in nature. *See Whorton v. Bockting*, 549 U.S. 406, 419-20 (2007). The *Crawford* Court did not define "testimonial," but provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations. *Crawford*, 541 U.S. at 51-52.The Confrontation Clause is not implicated when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U.S. 813, 823-26 (2006).

The threshold question here is whether the out-of-court statements were "testimonial." *United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007). The proper inquiry "is whether the declarant intends to bear testimony against the accused." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). The Court should consider "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id.* at 675. If a statement is not testimonial in nature, the Confrontation Clause has "no application." *Whorton*, 549 U.S. at 420.

The out-of-court statements challenged by Petitioner are the conversation Petitioner and Hamilton had after the crime that was overheard by Mack, and Mack's description of that

-14-

conversation to her mother which was overheard by Carthron. Neither of these statements were testimonial. They involved the two perpetrators of a crime discussing what had happened, and then a woman relying the overheard conversation to her mother. The statements made by the perpetrators were clearly not testimonial. *See, e.g., Davis*, 547 U.S. at 825 (indicating that "statements from one prisoner to another" are "clearly nontestimonial"). Likewise, Mack's statement to her mother was not testimonial. Remarks made to family members or acquaintances are generally considered nontestimonial. *Crawford*, 541 U.S. at 51-52, 56; *Desai v. Booker*, 538 F.3d 424, 427 (6th Cir. 2008) (casual remarks made to an acquaintance or a friend and not ones made to law enforcement are nontestimonual). Accordingly, Petitioner has not shown how his rights under the Confrontation Clause were implicated by Carthron's testimony.

The fact that the Michigan Court of Appeals found that the trial court erred in admitting the statement as a matter of state evidentiary law, but that the error was harmless, does not change the result. Federal habeas corpus relief does not lie for errors of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *See Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). This rule has been extended specifically to issues regarding the admissibility of evidence under Michigan's hearsay rules. *See Byrd v. Tessmer*, 82 F.App'x 147, 150 (6th Cir. 2003); *Rhea v. Jones*, 622 F. Supp. 2d 562, 589 (W.D. Mich. 2008); *Cathron v. Jones*, 190 F. Supp.2d 990, 996 (E.D. Mich. 2002). Therefore the admission of Cathron's testimony, even if erroneous under Michigan's rules of evidence, is not a cognizable habeas claim.

## D. Admission of Other Bad Acts Evidence

-15-

Petitioner's third habeas claim asserts that the trial court erred in allowing evidence to be admitted that Petitioner attempted to commit another robbery after the victim was killed in this case. The prosecutor sought to introduce the evidence to show that Petitioner was not surprised by Hamilton's attempted robbery of the victim, but that the two men were out on the night of the incident specifically to commit robberies. The Michigan Court of Appeals found that the evidence was admissible because: (1) the subsequent attempted robbery was part of the *res gestae* of the offense, and (2) it was admissible under Michigan Court Rule 404(b) to show Petitioner's intent.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of it. The United States Supreme Court declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990). While the Supreme Court addressed whether other bad acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id*. at 513; *see also Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Petitioner has failed to state a claim upon which habeas relief may be granted on this issue.

### E. Comment on Petitioner's Failure to Testify

Petitioner's fourth claim asserts that the prosecutor committed misconduct when in rebuttal

-16-

argument the prosecutor remarked on Petitioner's failure to testify at trial.  The Michigan Court of

Appeals found that the remark was not, in fact, aimed at drawing attention to the fact that Petitioner

did not testify in his own defense.  This decision constituted a reasonable determination of facts

under § 2254(d)(2).

A prosecutor's direct reference to a criminal defendant's failure to testify in his own defense

is a violation of the Fifth Amendment privilege against compelled self-incrimination. *Griffin v.*

*California*, 380 U.S. 609 (1965). "Indirect references on the failure to testify can also violate the

Fifth Amendment privilege." *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000).

The relevant portion of the prosecutor's rebuttal argument reads as follows:

Prosecutor: I get no satisfaction.  Counsel says I won't rest until I have the satisfaction of convicting Mr. Berry.  I don't get no satisfaction out of having to do this.  I get no satisfaction out of the fact that an eighteen year old has lost his life.  I don't get any satisfaction out of that, ladies and gentlemen.  But the law is the law, and we are a society of laws, and unless the guilty are brought to justice, I'd rather be out of a job.  I'd rather that I didn't have to stand before you and say convict this defendant because the facts have shown that he did what he did.  And he's here, he had an absolute right to say I am not guilty.

Court: Hold on a minute, please.  You cannot comment on him not testifying.

Prosecutor: Oh, I didn't say that, your Honor.  He's sitting here, we have a trial, he has an absolute right. . .

Court: Hold on a minute.  Maybe I missed your point then.  I though that you were commenting on the fact that he didn't testify.

Prosecutor: Oh, not at all, your Honor.

Court: I got it out of context.  I think I misunderstood what you're doing.  Go ahead.

Prosecutor: I'm sorry, your Honor.

Court: I missed your point.

Prosecutor: The Constitution, we talked about the concepts at the beginning.  The

-17-

Constitution provides every defendant with the presumption of innocence, all the rights that the Judge talked about, he absolutely has those rights. And we have – the Court has afforded him those rights and the burden of proving him guilty is right here at the prosecution table. I accept that responsibility. But once the facts are in, ladies and gentlemen, once the testimony has come forth, once you go back into that jury room and say I accept the evidence in this case because you know what happened, you know that they were out there doing robberies, you know he knew because the facts have shown that. From day one from statements that were made at the house to Ms. Mack, things that Kathy Carthon (sic) overheard, you know what they were doing, and you know he was in on it. So in talking about other thing that happened afterwards, it's to show his intent, it's to show his knowledge.

T 10/20/04, at 131-132.

Although the argument was somewhat rambling, the interpretation given to it by the Michigan Court of Appeals that the prosecutor did not comment on Petitioner's decision to remain silent, was not unreasonable. The prosecutor appears to have been responding to defense counsel's argument that she had some sort of personal vendetta against Petitioner. Rebuttal statements in response to a defendant's closing argument do not constitute prosecutorial misconduct. *United States v. Robinson*, 244 F.3d 503, 508 (6th Cir. 2001). The prosecutor's response was to assert that she had no personal interest in the case but that the prosecution was the logical result of Petitioner's exercise of his trial rights. No mention was made at all by the prosecutor of Petitioner's decision not to take the stand. Rather, after the trial court interjected, the prosecutor followed up her statement by talking about the constitutional right to the presumption of innocence, but how the evidence had overcome it. It requires a rather cynical reading of the record to characterize the comment as one directed at Petitioner's exercise of his Fifth Amendment rights. The interpretation of the statement given by the state appellate court was at least reasonable, and thus, habeas releif is not warranted. *See, e.g., Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (finding that when an ambiguous statement made during a final argument has more than one interpretation, the court should not adopt

the interpretation that "casts doubt upon the prosecutor's intentions.").

### F. Jury Instructions

Petitioner's fifth claim asserts that the trial court erroneously instructed the jury that it may infer that Petitioner aided and abetted the homicide by participating in the underlying assault.

Generally, claims of erroneous jury instructions are not cognizable in federal habeas review unless the instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). It is not enough to show that an instruction was incorrect under state law. *McGuire*, 502 U.S. at 71-72. The instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id*. at 147. "To warrant habeas relief, jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair." *Doan v. Carter*, 548 F.3d 449, 455 (6th Cir. 2008) (quoting *Austin v. Bell*, 126 F.3d 843, 846-47 (6th Cir.1997) (internal quotation marks omitted)).

The challenged portion of the instructions reads as follows:

Now, anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as an aider and abettor.

The prove this (sic) as an aider and abettor, the prosecutor must prove the following beyond a reasonable doubt:

First, that the alleged crime was actually committed either by the defendant or someone else. It does not matter whether anyone else had been convicted of that crime.

Second, that before or during the crime the defendant did something to assist in the commission of the crime.

Third, the defendant must have intended the commission of the crime alleged and must have known that the other person intended its commission at the time of

-19-

giving assistance.

\*\*\*

To be convicted as an aider and abettor the defendant must have had the requisite intent himself or participated in the crime while knowing that his co-participant possessed the requisite intent. To be convicted as an aider and abettor requirement (sic) requires a specific intent. The defendant must have had that specific intent himself or participated while knowing that his co-participant had that specific intent.

Even if the defendant knew that the alleged crime was planned or being committed, the mere fact he was present when it was committed is not enough to prove that he assisted in committing that crime.

\*\*\*

Now, the defendant is guilty of aiding and abetting felony murder if the defendant performed acts or gave encouragement that assisted the commission of a killing of a human being, and it was done with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result while committing or attempting to commit or assisting in the commission of the predicate felony, here assault with intent to commit robbery.

Aiding and abetting describes all forms of assistance rendered to the perpetrator of a crime. All words or deeds that might support, encourage, or incite the commission of a crime. *A jury may infer that the defendant aided and abetted the killing by participating in the underlying offense.*

\*\*\*

Now, again, the defendant is charged with first degree felony murder. To prove this, the prosecutor must prove each of the following elements beyond a reasonable doubt:

\*\*\*

And second, that the defendant had one of these three states of mind where he aided and abetted that with that in mind, that he intended to kill, intended to do great bodily harm to the deceased, or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions.

Tr. 10/20/04, at 155-158 (emphasis added).

-20-

Petitioner asserts that the sentence italicized above erroneously allowed the jury to convict Petitioner as an aider and abettor even if he did not independently possess the required mental state for murder, as required by Michigan law. The argument requires a rather strained reading of the instructions. The sentence in question appears in the portion of the instruction that deals with what acts constitute aiding and abetting – not the mental state required for aiding and abetting. It correctly stated that participation in the underlying offense allows for inference that the defendant aided the felony-murder. *See People v. Bulls*, 262 Mich. App. 618, 625 (2004) ("A jury may infer that the defendant aided and abetted the killing by participating in the underlying offense"). The portion of the instructions dealing with the required mental state for aiding and abetting felony murder clearly instructed the jury on the requirement that the defendant independently posses the mental state for murder or know that the principal possesses it. That requirement appears twice before and once after the challenged sentence as quoted above. In fact the immediately preceding paragraph in the instruction states the requirement that "the defendant performed acts or gave encouragement that assisted the commission of a killing of a human being, *and* it was done with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result while committing or attempting to commit or assisting in the commission of the predicate felony, here assault with intent to commit robbery." Id. Reading the instruction as a whole, there is no probability that the jury believed the prosecutor was only required to show that Petitioner participated in the underlying crime to be guilty of felony murder under an aiding or abetting theory. The claim is therefore without merit.

### G. Sufficiency of the Evidence

Petitioner's sixth claim asserts that there was insufficient evidence presented at trial to

sustain his conviction for felony murder. Specifically, he argues that there was insufficient evidence offered to show that he had the requisite mental state for murder or that he knew of Hamilton's intent to commit murder. Petitioner supports the argument primarily by referring to Hamilton's testimony that he did not know he was going to shoot the victim when he got out of the car with Petitioner. Hamilton also testified that he shot the victim only because it was his first time holding a gun and he was nervous when the victim refused to cooperate with him.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

Under Michigan law, The elements of first-degree felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in Michigan Compiled Laws § 750.316(1)(b). *People v. Smith*, 478 Mich. 292, 318-319 (2007). To be convicted of aiding and abetting felony murder, "[t]he requisite intent is that necessary to be convicted of the crime as a principal." *People v. Kelly*, 423 Mich. 261, 278

-22-

(1985). "[I]t therefore must be shown that the aider and abettor had the intent to kill, the intent to cause great bodily harm or wantonly and wilfully disregarded the likelihood of the natural tendency of his behavior to cause death or great bodily harm." *Id.*  "[I]f the aider and abettor participates in a crime with knowledge of his principal's intent to kill or to cause great bodily harm, he is acting with 'wanton and willful disregard' sufficient to support a finding of malice...." *Kelly*, supra at 278-279 (citation omitted). An "aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *People v. Carines*, 460 Mich. 750, 758 (1999).

The evidence showed that Petitioner and Hamilton went out to perform a robbery.  Viewed in a light most favorably to the prosecution, the evidence also showed that Petitioner gave Hamilton a loaded handgun at the gas station and told him to rob the victim. When the victim refused to comply with Hamilton's demands, Hamilton shot him in the head.  Hamilton, of course, testified that he never intended to kill the victim and simply panicked. But the jury need not have accepted that testimony as true, and indeed it  must have rejected Hamilton's claim in light of the fact that it found Petitioner guilty. This Court cannot redetermine the credibility of the witnesses whose demeanor has been observed by the jury.  *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).  "A reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120,    , 130 S. Ct. 665, 175 L. Ed. 2d 582 (2010), (quoting *Jackson*, 443 U.S. at 326). While there is no direct evidence that Hamilton intended to kill the victim and that Petitioner knew

-23-

of this intent,  "[a] conviction may be sustained based on nothing more than circumstantial evidence." *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008). Nor must the evidence exclude every reasonable hypothesis except guilt. *Id.*  The circumstances of this case–Petitioner giving a loaded gun to Hamilton to facilitate an armed robbery followed by Hamilton immediately shooting the victim in the head–allowed for a rational trier of fact to find beyond a reasonable doubt that Petitioner wantonly and wilfully disregarded the likelihood of the natural tendency of his behavior to cause death or great bodily harm. *Kelly, supra.*  Accordingly, sufficient evidence was presented at trial to sustain Petitioner's conviction for felony murder.

### H. Ineffective Assistance of Trial Counsel

Petitioner's seventh claim is that the his trial counsel was ineffective when he: (1) fell asleep during jury instructions; (2) failed to obtain jail documents failing to show Hamilton's perjury; (3) failed to object to prosecutorial misconduct; (4) failed to object to the erroneous jury instruction; (5) failed to effectively cross-examine the state's star witness; and (6) failed to raise the double jeopardy issue at sentencing.

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability

-24-

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. A court's review of counsel's performance must be "highly deferential." *Id*. at 689.

Habeas relief may be granted only if the state court decision unreasonably applied the standard for evaluating ineffective assistance of counsel claims established by *Strickland*. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). The Supreme Court recently confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

It should be noted that Petitioner seeks an evidentiary hearing to supplement the record in support of his ineffective assistance of counsel claim, but habeas review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011). Consequently, Petitioner is "is stuck with 'the record that was before the state court,'" and "is not entitled to an evidentiary hearing." *Bourne v. Curtin*, 666 F.3d 411, 415 (6th Cir. 2012) (quoting *Pinholster*, 131 S. Ct. at 1398), cert denied, 132 S. Ct. 2749, 183 L. Ed. 2d 616, 2012 WL 1340784 (U.S. 2012).

The Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel claim:

> Defendant further argues that he was deprived of the effective assistance of counsel at trial because his retained counsel slept during jury instructions and closing

argument, left the courtroom during the prosecutor's rebuttal argument, and failed to obtain jail records to impeach Hamilton's testimony that defendant initiated an altercation between Hamilton and defendant while the two were incarcerated. We disagree.

To establish ineffective assistance of his trial counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; that but for his counsel's errors, there is a reasonable probability that the results of his trial would have been different; and that the proceedings were fundamentally unfair or unreliable. *People v. Toma*, 462 Mich. 281, 302-303 (2000); *People v. Rodgers*, 248 Mich. App. 702, 714 (2001). To establish that his trial counsel's performance was deficient, "defendant must overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances." *Toma*, supra at 302. Effective assistance of counsel is presumed and defendant bears a heavy burden of proving otherwise. *People v. LeBlanc*, 465 Mich. 575, 578 (2002); *People v. Solmonson*, 261 Mich. App. 657, 663 (2004).

Before trial, it became known that defendant's retained counsel was facing criminal drug charges. Defendant was aware of his counsel's circumstances and repeatedly stated that he wished to stay with his counsel. The trial court took the precautionary step of affording defendant appointed counsel to act as co-counsel throughout the proceedings. Appointed counsel filed pre-trial motions and was present at counsel's table throughout the trial, including during jury instructions and closing arguments. Appointed counsel actually raised a concern with the jury instructions after they were read and the trial court addressed the concern. Appointed counsel also moved for a mistrial based on the prosecutor's comments during rebuttal. We find that the record amply demonstrates that appointed counsel was present and took action on defendant's behalf at all times that defendant's retained counsel was allegedly absent or asleep. Defendant was fully represented by competent counsel, and he does not argue that his appointed trial counsel was ineffective. Therefore, defendant cannot demonstrate prejudice arising from his retained counsel's conduct. Toma, supra.

Defendant also asserts that his retained trial counsel was ineffective for failing to obtain jail records that would have impeached Hamilton's testimony that defendant initiated an altercation between the two men at the jail. Decisions regarding what evidence to present are presumed to be matters of trial strategy, and the failure to present evidence constitutes ineffective assistance of counsel only when it deprives the defendant of a substantial defense. *People v. Dixon*, 263 Mich. App. 393, 398 (2004); *People v. Rockey*, 237 Mich. App. 74, 76 (1999). A substantial defense is one that might have made a difference in the outcome of the trial. *People v. Kelly*, 186 Mich. App. 524, 526 (1994).

-26-

Hamilton testified that defendant initiated the altercation. However, Hamilton acknowledged that he spent time in segregation as a result of the fight, and another inmate testified that Hamilton had admitted that he actually initiated the fight by hitting defendant in the mouth. Therefore, the jury was presented with evidence indicating that, contrary to his testimony, Hamilton initiated the altercation with defendant. Accordingly, defendant cannot establish that he was deprived of any substantial defense by retained counsel's decision not to introduce additional evidence that addressed the same issue. *Dixon*, *supra*.

*Berry*, 2006 Mich. App. LEXIS 2389, 7-11. (Mich. Ct. App. July 27, 2006)

This decision is reasonable because based on the existing record, a reasonable argument can be made that counsel satisfied *Strickland's* deferential standard. *Harrington*, 131 S. Ct. at 788. The record supports the state appellate court's determination that Petitioner's second attorney provided him with effective representation when his other attorney allegedly fell asleep. Nor was counsel necessarily ineffective for failing to discover additional materials to impeach Hamilton. The Constitution does not require defense counsel to pursue every imaginable trial strategy, whether likely to bear fruit or not. *See Engle v. Isaac*, 456 U.S. 107, 134 (1982). And for the reasons stated above, counsel was not required to make meritless objections regarding the prosecutor's closing argument, the jury instructions, or Petitioner receiving sentences for both felony murder and the assault. Finally, a fair reading of counsel's cross-examination of Hamilton shows that a reasonable argument can be made that it was not deficient. Accordingly, Petitioner's ineffective assistance of counsel claim is without merit.

### I. Ineffective Assistance of Appellate Counsel

Petitioner's final claim asserts that his appellate counsel was ineffective for failing to raise the claims raised in his motion for relief from judgment in his direct appeal. This claim is not raised as an independent ground for habeas relief, but rather it seeks to demonstrate "cause" to excuse the alleged procedural default of the underlying claims. Because the Court did not impose a default and

found those claims to be without merit, Petitioner's ineffective assistance of appellate counsel claim is moot. *See, e.g., Thompkins v. Ludwig*, 2011 U.S. Dist. LEXIS 45803 ( E.D. Mich. Apr. 28, 2011).

## IV. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37. The Court concludes that a certificate of appealability is not warranted in this case because reasonable jurists could not debate the Court's assessment of Petitioner's claims. The Court will also deny Petitioner permission to proceed on appeal in forma pauperis because an appeal could not be taken in good faith.

## V. Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**. A certificate of appealability is also **DENIED**. Finally, permission to proceed on appeal in forma pauperis is **DENIED**.

**IT IS ORDERED**.

S/Victoria A. Roberts
_____
Victoria A. Roberts
United States District Judge

Dated:  September 26, 2012

The undersigned certifies that a copy of this
document was served on the attorneys of record
by electronic means or U.S. Mail on September
26, 2012.

S/Linda Vertriest
_____
Deputy Clerk